In the matter of probate of the last will of Nancy H. Ingalls, deceased.

*Filed at Ottawa November 29, 1893.*

1. WILL—*probate—belief of testator's capacity, at what time.* If the attesting witnesses, at the time a will is signed and attested, believe that the testator or testatrix was of sound mind and memory, that will be sufficient to admit the will to probate. The right to probate the will is not dependent upon the belief of the attesting witnesses formed after their attestation.

2. SAME—*probate, an ex parte proceeding.* The probate of wills in the county court, under our practice, is an *ex parte* proceeding. The statute contemplates no contest, and requires no citation to the heirs, etc., and the proof necessary to entitle the will to probate is confined to the particular facts specified by the statute, and the judgment rendered is not an adjudication which is in any degree conclusive of the right of any person interested to contest the will by bill in chancery.

APPEAL from the Circuit Court of Boone county; the Hon. CHARLES KELLUM, Judge, presiding. .

Mr. ROBERT W. WRIGHT, for the appellant.

Mr. CHARLES E. FULLER, and Mr. W. C. DEWOLF, for the appellees.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This is an appeal from the judgment of the Circuit Court of Boone county, refusing to admit to probate the last will and testament of Nancy H. Ingalls, deceased. The testatrix died October 16, 1892, leaving an instrument purporting to be her will, in which, after providing for the payment of her debts, designating a place for her burial, and making two specific bequests, one of her watch, chain, wearing apparel and household effects, to her grand-daughter, Gertrude Ingalls, and one of $2000 to her foster-child, Mary Latshaw, she devised all the residue of her estate, both real and personal, to her brother-in-law, General Rufus Ingalls, of New York City, in trust for the following purposes, to-wit: to be by him converted into money, and of the moneys thus obtained the trustee was directed:

First. To invest the sum of $6000 in safe and reliable interest bearing securities, with power to change the same from time to time, as the trustee should deem wisest and best, and pay the net income to the testatrix' grand-daughter, Gertrude. Ingalls, semi-annually, during the period of her natural life.

Second. Should there be anything remaining, the trustee was further directed to invest the same, provided it did not exceed $3000, and pay the net income thereof to the testatrix' grand-daughter, Clara Ingalls, semi-annually, during the period of her natural life.

Third. The residue, if any there should be, was directed to be paid over to certain Presbyterian churches and certain missionary societies particularly named, and it was further provided that in case of the death of Gertrude Ingalls and Clara Ingalls, or either of them, the sum or sums invested for the benefit of the beneficiary or beneficiaries so dying shoul l be paid over to the trustees, directors or managers of the Foundlings' Home of the city of Chicago.

And it was further provided that, if the testatrix should not die seized and possessed of property sufficient in value to pay

all the legacies and to carry out all the trusts in the will men-
tioned, the legacies and trust funds should not be abated
equally, but the legacy to the testatrix' grand-daughter, Ger-
trude Ingalls should be paid first, and the $6000 should be
invested for her benefit, before any other legacies should be
paid, or any trust moneys paid over to the persons or corpo-
rations entitled thereto; meaning that the legacy to Gertrude
Ingalls and the investment for her benefit should be first paid
and made befu e all else.

General Rufus Ingalls was appointed sole executor of the
will, and in case of his failure, refusal or inability to act,
Omer H. Wright was nominated and appointed executor and
trustee, and in case of his death, failure or inability to act,
the Circuit Court of Boone county, sitting as a court of chan-
cery, was authorized to appoint a successor in trust, but it
was expressly provided that in no event should Emily Ingalls,
the widow of the testatrix' deceased son, or Chandler A. Dun-
well her father, be appointed or allowed to serve as either
trustee or executor of the will. The will bore date August 11,
1890, and was witnessed by John C. Foote and John Kuppler,
both residing at Belvidere, Illinois.

After the death of the testatrix, the will was presented by
the executor therein named to the County Court of Boone
county for probate, and the two subscribing witnesses thereto
also appeared before the court, and declared upon their re-
spective oaths that they were present at the execution of the
will; that they subscribed their names thereto as the attesting
witnesses at the request of the testatrix and in her presence
and in the presence of each other, on the day of the date there-
of; that she then and there subscribed her name thereto in
their presence, and declared the same to be her last will and
testament, and that they believed that the testatrix at the time
of executing the same was of full age, of sound mind and
memory, and under no constraint. On this proof, it was or-
dered and adjudged by the County Court that the instrument

thus presented be considered duly and sufficiently proved, and that it be admitted to record as the last will and testament of Nancy H. Ingalls, deceased. From this order, Clara Ingalls, one of the grand-daughters of the testatrix, prayed and perfected an appeal to the Circuit Court of Boone County.

At the trial in the Circuit Court, which, by agreement of the parties, was had before the court without a jury, the will and the testimony of the subscribing witnesses, as taken in the County Court, were read in evidence, and the two subscribing witnesses were called and examined orally. Upon such examination, John Kuppler testified, in substance, as follows: I am a subscribing witness to the will of Nancy H. Ingalls. The will was made August 11, 1890. I signed it at the request of Mrs. Ingalls, and John G. Foote also signed it as a witness. We signed it in the presence of each other and in the presence of Mrs. Ingalls. She told us what the paper was; said she was disposing of her property by will. At the time I signed the will as a witness, I believed Mrs. Ingalls to be of disposing mind and memory. The only thing we heard her say was that this was her will. She said: "I suppose you understand what this is?" and we told her: "Yes." She said it was her will; that was about all that was said. She seemed to be intelligent and rational. I never was very well acquainted with her; had seen her a great many times, but had never had any talk or any business with her.

On cross-examination he said: At the time the will was signed, it was my opinion that she was capable of making a will, but since then it may have been that she was not. I have no opinion from my own knowledge, but from what I have heard I have an opinion that she may have been prejudiced at the time. At the time she executed the will, I did not think she was affected with insane delusions. My opinion now is that she may have been, but at that time I supposed she was capable. I am not at all sure that she was of sound mind at that time. I never heard her talk about the poison-

ing matter, and previous to the signing of the will, I had heard no talk about it in the community.

John C. Foote, the other subscribing witness, testified, in substance, as follows: I signed the will as one of the subscribing witnesses. It was made in August, 1890, Mr. Kuppler being the other witness. I was requested to sign the will as witness by Mrs. Ingalls. It was signed by her in our presence, and we signed as witnesses in her presence. She stated that it was her last will. I had known Mrs. Ingalls more or less for twenty years. She traded some at our store. She was about seventy years old. At the time she signed the will she was under no constraint that I know of; it appeared to be her free act. In my judgment, she was capable of transacting ordinary business at the time. She appeared to know and comprehend the transaction and what she was doing. I do not remember that at that time I noticed anything peculiar in her so far as her mental faculties were concerned. I then believed she was capable of transacting ordinary business.

On cross-examination he said: At the time of the hearing in the Probate Court I thought Mrs. Ingalls was capable of doing ordinary business, but I knew that she was prejudiced as regards her son's wife, and I hesitated about signing the affidavit, because I thought that prejudice—that delusion you might call it—might bias or prejudice her as regards her grand-children. From my own knowledge, I have the impression that she was laboring under a delusion as regards her son's wife, and from what I have been told since, I have the impression that this delusion prejudiced and biased her as regards her grand-children, but that is from what has been told me, and not from what I know of her. I know she thought her son's wife had been attempting to poison her; she told me so. It was a matter of common notoriety that she had that delusion. I know her daughter-in-law and her children left Mrs. Ingall's house, but do not know whether they were compelled to leave on account of this charge.

On further examination on behalf of the proponent of the will he said: I think it was a delusion from the way Mrs. Ingalls talked when she told me about it. She mentioned a great number of times they had attempted to poison her with "Rough on Rats," I do not know how many, and soon after she said it was fourteen times, and her appearance at the time indicated to me that it was a delusion. The first time she mentioned it was before I signed the will as witness. I do not remember that I thought about or called to mind her mental capacity at that time, but presume I did. I never heard her say anything about the grand-children. I do not know whether she thought there was evidence upon which to base the charge of poisoning, but think she did, or else she would not have stated the fact. I think she continued to manage and conduct her own business affairs after that time. She was a widow, and had no one to manage her affairs, and so looked after them herself. Except for this prejudice or delusion, she was capable, at the time she signed the will, of transacting ordinary business affairs, and she did transact them. The only question in my mind about the will is whether this delusion would bias and prejudice her in regard to the children, and that I do not know of my own knowledge, but have an opinion that it would. At the time I signed the will as a witness, I believed her competent to make a will.

The fair conclusion to be drawn from the testimony of these witnesses is, that at the time they signed the will as attesting witnesses, they both believed that the testatrix was of sound mind and memory. Their testimony given upon the probate of the will in the County Court is in evidence here, and there both witnesses testify that they believed that the testatrix, at the time of executing the will, was of sound mind and memory, and we find nothing in their testimony given in the Circuit Court on the hearing of the appeal, which seems in any material degree to conflict with their testimony as there given. Kuppler testifies that, at the time he signed the will as wit-

ness, he believed the testatrix to be of a disposing mind and memory; that she seemed to be intelligent and rational; that it was his opinion that she was capable of making a will, and that he did not then think she was affected with insane delusions. Foote also testifies that, at the time of the execution of the will, the testatrix appeared to know and comprehend the transaction and what she was doing; that he then believed she was capable of transacting ordinary business; that at the time he signed as witness, he believed her competent to make a will.

It is true, both the witnesses, and especially Foote, seem to have subsequently come to the conclusion that the testatrix, at the time she made the will, was laboring under the belief, which the witnesses characterize as a delusion, that her daughter-in-law, who was the mother of the testatrix' grandchildren, had repeatedly attempted to poison the testatrix, and that such belief or delusion, in the opinions of the witnesses, was of such character as to be likely to have some influence upon the mind of the testatrix in making provision in her will for her grand-children. But it seems very clear from all the evidence that this belief did not exist in the minds of the witnesses at the time they attested the will, their belief then being that the testatrix was of sound mind and memory, and capable of disposing of her property by will. The question then is, whether these opinions of the witnesses, formed subsequently to their becoming attesting witnesses, are to be considered upon the question of the right of the proponent to have the will admitted to probate.

The second section of the Statute of Wills, so far as it is material to this question, is as follows: "All wills, testaments and codicils, by which any lands, tenements, hereditaments, annuities, rents or goods and chattels are devised, shall be reduced to writing, and signed by the testator or testatrix, or by some person in his or her presence, and by his or her direction, and attested in the presence of the testator or testatrix,

by two or more credible witnesses, two of whom, declaring on oath or affirmation, before the County Court of the proper county, that they were present and saw the testator or testatrix sign said will, testament or codicil, in their presence, or acknowledged the same to be his or her act and deed, and that they believed the testator or testatrix to be of sound mind and memory at the time of signing or acknowledging the same, shall be sufficient proof of the execution of said will, to admit the same to record: Provided, that no proof of fraud, compulsion or other improper conduct be exhibited, which in the opinion of said County Court shall be deemed sufficient to invalidate or destroy the same."

Is the belief as to the sanity of the testatrix to which the attesting witnesses are required to depose in proceedings to probate the will, that entertained by them at the time the will was executed, or their belief at the time their testimony is taken? This question would seem to be settled by the very terms of the statute. The witnesses are required to declare that they were present and saw the testator sign, etc., and that they "believed" him to be of sound mind and memory at the time of signing the will. Believed when? Manifestly at the time of the execution of the will. If it was the intention of the statute to require their belief at the time their testimony is taken, the present and not the past tense of the word "believe" would naturally have been employed.

And this interpretation seems to be the most reasonable one, in view of the nature and consequences of the proceeding. It should be remembered that the probate of wills in the County Court, under our practice, is an *ex parte* proceeding. It contemplates no contest, and requires no citation of the heirs, devisees or other representatives of the testator. The proof necessary to entitle the will to probate is confined to the particular facts specified by the statute, and is for the purpose of establishing, *prima facie*, the validity of the will, so as to entitle it to be recorded. The judgment rendered is

not an adjudication which is in any degree conclusive upon the right of any person interested to contest the will by bill in chancery. In fact, the proceeding in chancery provided for by the seventh section seems to be the only one provided for contesting the validity of wills, the admission of the will to probate being only preliminary to such contest, and as would appear from the phraseology of section seven, where probate is denied, no contest can be had.

Under these circumstances, it was doubtless the intention of the statute to limit the inquiry, in proceedings of this character, to the belief as to the sanity of the testator, entertained by the attesting witnesses at the time the will was executed. Their belief at that time is a matter about which the testator can inform himself, so as to be reasonably certain of the admission of his will to probate, but how far that belief may be modified by subsequent circumstances, or by facts which may subsequently be brought to their attention, he of course can know nothing. If then the probate of wills is to depend, not upon the belief of the attesting witnesses as to the sanity of the testator at the date of the will, but upon those beliefs as subsequently modified, no testator can feel assured that his will will be admitted to probate, but is forced to leave that event subject to such changes as subsequent influences, legitimate or illegitimate, may produce in the witness' opinions. This, we think, was not the intention of the statute. If the attesting witnesses, at the time the will was signed, believed that the testator was of sound mind and memory, that is sufficient, and the will should in this proceeding, be deemed to have been sufficiently proved. If that opinion was erroneous, such fact can be shown in a proceeding in chancery to contest the will. This, however, is not the place for such contest.

We think the Circuit Court erred in refusing to admit the will in this case to probate, and for that error the judgment will be reversed, and the cause will be remanded to that court for further proceedings.       *Judgment reversed.*